## SMITH v. ST. PAUL FIRE & MARINE INS. CO.

District Court, E. D. New York.

May 27, 1942.

See, also, D.C., 23 F.Supp. 420; D.C., 25 F.Supp. 745; D.C., 35 F.Supp. 80.

Badger & Lockwood, of New York City, for plaintiff.

Bigham, Englar, Jones & Houston, of New York City (John M. Aherne, of New York City, of counsel), for defendant.

ABRUZZO, District Judge.

The plaintiff has brought this action for damages from the defendant on the ground that the defendant is withholding and converted to its own use without right all of the business of the plaintiff which consists of an insurance agency.

This agency carried on in the main a baggage insurance business. In connection with the agency, Lewis C. Smith, deceased, husband of the executrix bringing this suit, made agreements with railroad ticket agencies, travel agencies, steamship and bus agencies. Lewis Smith in his lifetime made an agreement with the defendant, Saint Paul Fire and Marine Insurance Company, hereinafter called Saint Paul, by virtue of which all of the baggage insurance obtained by said Smith was to be turned over by him as agent to St. Paul. Smith also acted as baggage insurance agent for Commercial Union Assurance Co., Ltd., but in July of 1934 he relinquished his agency for Commercial Union and up until his death he transacted business solely with the defendant.

Smith died on July 31, 1937. It is alleged by the plaintiff that the defendant, after her husband's demise, took over the agency, its contracts, business records, books of accounts, stationery, policies of insurance, trade-name, lists of customers, sub-agents, office employees and good will; and converted same to its own use to the exclusion of any individual or executory

rights which Josephine N. Smith, plaintiff, might have in this agency.

Pursuant to the terms of the agreement, from January 1, 1932, to July 31, 1937, the date of the death of Lewis C. Smith, he was empowered to select various persons, including travel agents, steamship agents and railroad ticket agents and bus ticket agents to write baggage insurance and to issue Saint Paul baggage insurance policies. The agents were appointed by Saint Paul pursuant to the laws of the various states in which such agents operated. These agents actually sold and issued policies to the traveling public. It was their duty to report directly to Lewis C. Smith and remit all premiums to him, less their commission. He, in turn, was to account for and pay to Saint Paul all the premiums thus collected, less his commission. These commissions constituted Lewis C. Smith's whole compensation as agent. He was to receive forty-seven and one-half (47½%) per cent of the gross premium (premium paid by the purchaser of the policy). Under the provisions of the agreement, Smith was to pay all the commissions of the agent who actually issued the policy and all other expenses pertinent to the conducting of the agency including: office overhead, rent, salaries, and so forth; license fees; printing of policies and supplies; expenses of adjusting losses and traveling expenses. Saint Paul was to receive fifty-two and one-half (52½%) per cent of the premiums and was to bear all baggage losses sustained and pay taxes on the premiums.

The evidence revealed that out of his share of forty-seven and one-half (47½%) per cent, Smith paid railroad agents an average of 37%, steamship companies an average of 35% and travel agents and bus lines an average of 30% (plaintiff's exhibits 20 and 23, rec. 462-3). Consequently, Smith's net income was approximately 12½% or 12½¢ of every premium dollar; and it was from that income he had to run his office and pay all of the expenses enumerated above.

In answer to this alleged conversion of the agency, Saint Paul has interposed the following defenses:

1. General denial.

2. That the whole agency, with all records and everything thereunto appertaining, was transferred to defendant by plaintiff in consideration of a debt of $63,277.08 for unreported insurance premiums owing by the agency to defendant.

3. That in any event upon the death of the agent the agency terminated, and defendant became entitled to the possession of all the books, records, and policies pertaining to its business risks and obligations, past and future.

4. That the agency had no status independent of the principal and that the records of the agent were the property of the principal.

There is no dispute between the parties that upon the death of Smith, the agency contract between Smith and Saint Paul was terminated and at an end.

There is no question that the Lewis C. Smith Agency was indebted to Saint Paul in the sum of $63,277.08 on the date of Smith's death for premiums collected on behalf of Saint Paul but never transmitted to them. This issue was tried before a trial term of this district and this amount was fixed as due and owing from Smith to Saint Paul.

In the event, that a verdict were to be rendered in favor of the plaintiff, the amount so due must be deducted therefrom.

This action originally appeared on the jury calendar but a jury was waived and the case proceeded to trial before this Court without a jury. The defenses interposed by the Saint Paul in effect are merged into one main one, to wit, that it was justified in taking over the agency under the circumstances.

It is conceded and the evidence amply indicates that the defendant took over the agency, including the contracts, business records, books of accounts and other items above enumerated, and continued this baggage insurance business for its own use and benefit, and that the plaintiff has received nothing by way of remuneration.

The evidence indicates conclusively that Saint Paul overreached the plaintiff and converted the agency to its own use without legal right. It has sought to substantiate its action and conduct, claiming it was justified in taking the agency because of the large debt owed to it; but manifestly it could not simply convert the agency to its own use in the manner adopted by it. The Saint Paul made itself the judge of the facts, gave itself a judgment; and, so to speak, at a private sale, bought the agency without paying anything for it because of the debt of $63,277.08 owed to it. Thus, Mrs. Smith's share and any assets due possible creditors of the agency were quickly

and completely wiped out. The possible value of the agency at that time was destroyed. The evidence amply justifies this conclusion.

After the demise of Smith on July 31, 1937, the books, records and other pertinencies of the Smith agency were turned over to Saint Paul. The plaintiff contends that they were to be returned after an inventory and audit were made. The Saint Paul maintains that an agreement was reached with the plaintiff whereby the agency with all its appurtenances were to be turned over to Saint Paul for operation to offset the debt due and owing the Saint Paul by the deceased Smith. The agency was operated for a short period of time by Mrs. Smith with the consent of the Saint Paul. One Donovan, plaintiff's attorney at that time, apparently conducted the insurance agency for her. He was on the payroll and was paid by checks drawn and signed by Mrs. Smith on the account of the Smith agency.

On August 7, 1937, consent was given to inventory and audit the books of the agency (rec. 43–44). On that date, it appears from the testimony, the parties became somewhat estranged.

It was the desire of Mrs. Smith, the plaintiff, to continue the agency and she was endeavoring to secure authority from Saint Paul to do so. She desired to obtain a new agreement.

The preliminary report of the auditors disclosed that the deceased was indebted to Saint Paul in the sum of $24,908.70 for a period of one year and seven months from January 1, 1936, to August 12, 1937. A subsequent and more complete audit covering the entire period in which the agreement between Smith and St. Paul was in effect disclosed an indebtedness of $63,277.08. The Smith agency was clearly insolvent.

Negotiations were being conducted on one side by Donovan, the attorney representing Mrs. Smith; and by Drake and Boylan for Saint Paul. After the audit, Saint Paul informed Donovan that the whole agency—"lock, stock and barrel"— had to be turned over to Saint Paul. He was told that "under no circumstances would the company permit Mrs. Smith to continue the agency" for Saint Paul (rec. 438–9).

Donovan informed Boylan and Drake after conferences with Mrs. Smith that he believed that she was ready to turn over the agency if they demanded it (rec. 442–443). After this demand was made, Donovan testified that Mrs. Smith agreed to turn over the agency and gave Saint Paul a check for $3,500 which represented a large part of the balance then in the agency account (rec. 446, 447 & 449).

As a result of these conferences, the Saint Paul sent men to remove the files, railroad contracts, policies and other appurtenances necessary to operate the agency. It was disclosed that Mrs. Smith was present during the removal of the appurtenances (rec. 514).

Saint Paul took over the employees of the Smith agency. The defendant claims that Mrs. Smith co-operated to the fullest extent with Saint Paul.

Mrs. Smith, in her testimony, denies that she ever agreed to turn over this agency "lock, stock and barrel". It appears that the negotiations concerning the turning over of the agency took place between Donovan and Drake and Boylan. Mrs. Smith never entered directly into the negotiations with Drake and Boylan. As to what Mrs. Smith agreed to, so to speak, is "second-handed".

The correspondence between Saint Paul and Mrs. Smith casts some light upon the transactions.

On August 31, 1937, the plaintiff wrote to Saint Paul as follows:

"August 31, 1937

"St. Paul Fire & Marine Insurance Co.
"107 William St.
"New York, New York

"Attention of Mr. W. F. Boylan

"Dear Sirs:

"You are hereby authorized to inventory the books and records of Lewis C. Smith, who was your agent during his lifetime and to remove from the office of the agency at #24 Stone Street, New York City, the following:

"1. All outstanding loss files.

"2. All certificates or policies, or copies of certificates of policies which have been issued and which are now in the files of this agency.

"3. Such supplies, policy forms and other forms as you may require.

"All other books, papers, records, and accounts in connection with the business as it pertains to the St. Paul Fire & Marine

Insurance Company will be turned over to you upon request.

"Very truly yours,

"Sole Legatee and Temporary Administratrix of the Estate of Lewis C. Smith."

(Exhibit No. 14)

Again, on September 1, 1937, the St. Paul received the following letter from the plaintiff:

"September 1st, 1937

"St. Paul Fire & Marine Insurance Company
"107 William Street
"New York, New York

"Attention of Mr. W. F. Boylan

"Dear Sirs:

"I hereby authorize you to remove from the office of Lewis C. Smith Agency, #24 Stone Street, New York, New York,

"All steel or other filing cabinets, shelving and other filing equipment;

"All typewriters, adding machines, stamps and stamping machines;

"and to retain the above in your custody and to return them to the undersigned upon demand in the same condition as when received by you, wear and tear excepted.

"Very truly yours,

"Temporary Administratrix and sole Legatee of the Estate of Lewis C. Smith, deceased."

(Exhibit No. 15)

After Donovan had been substituted by new attorneys, the following demand was sent to Saint Paul:

"November 9, 1937

"St. Paul Fire & Marine Insurance Company
"107 William Street
"New York, N. Y.

"Attention: Mr. William F. Boylan, Manager

"Dear Sirs:

"On August 31st, 1937, I authorized you to inventory the books and records of Lewis C. Smith and for this purpose all the books, papers, records and accounts in connection with the business of the agency were turned over to you.

"On September 1st, I authorized you to remove all filing cabinets, shelving and other filing equipment, typewriters, adding machines, stamps and stamping machines,

all of these subject to be returned to me on demand.

"I now demand that all outstanding loss files, all certificates or policies or copies of certificates of policies which have been issued and which are now in the files of this agency, such supplies, policy forms and other forms, all books, papers, records and accounts in connection with the business of the agency of Lewis C. Smith, all filing and other cabinets, shelving and other filing equipment, all typewriters, adding machines, stamps and stamping machines be forthwith returned to the office of the agency at 24 Stone Street, New York, N. Y.

"Please advise me when these will be shipped so that I can make arrangements for their accomodation.

"Very truly yours,

"Josephine N. Smith

"Individually and as Executrix of the Estate of Lewis C. Smith."

(Exhibit No. 13)

Saint Paul did not reply to these letters. There is some evidence that a release was prepared by Saint Paul to be signed by Mrs. Smith but this instrument was never executed.

Saint Paul was represented by attorneys throughout the transactions with Mrs. Smith. While she had an individual interest in the agency which she could have legally released, the estate owned the remaining share of the business and how the attorneys expected a release to be executed without an order of the Surrogate is beyond this Court's comprehension.

There may be many other creditors of this estate and it was the duty of the Saint Paul to at least be fair to them. A transfer of the business without notice to these creditors would make the transfer ineffectual. Nowhere in the negotiations between Donovan and Saint Paul was the question of possible creditors ever discussed. The estate had a right, of course, to a public auction of the assets of the Smith Agency. By its action, the Saint Paul foreclosed that right. A sale might have brought a price, at that time, in excess of the debt.

The letters written by Mrs. Smith were indicative of the fact that it was not her intention to forego her rights and when that became apparent it was the plain duty of the Saint Paul to seek the aid of the Courts and by legal means protect its rights

and the rights of all others having an interest in this agency. Clearly, the conversion was illegal. In Northrup v. McGill, 27 Mich. 234, 239, it was observed:

" * * * No creditor, without process, and without authority or right, except such as belongs to him as creditor, can dispossess his debtor of his goods and then mitigate or defeat a recovery by showing that the property taken has, without any assent or concession of the debtor, been applied on the debt.

"Such intervention must have the sanction of the debtor or the law. The opposite view would lead to gross oppression and unlimited abuses. The creditor would be enabled to take the law into his own hands, and to unite in himself the power to judge and execute in his own favor and according to his own pleasure."

I find as a fact that the Saint Paul without right converted this agency to its own use.

The plaintiff is entitled to compensation if a value of the agency at the time of its conversion by the Saint Paul can be fixed.

Mrs. Smith relies upon the testimony of the expert, Samuel Newman. He was in the general insurance business for some forty years and qualified as an expert. Newman valued the agency at $150,000, assuming that a profit of $15,000 per year for ten years could be made. However, he probably judged the value of this business on the basis of the running of his own insurance business and there is nothing in the record to warrant such a finding.

The financial history of the Smith Agency may be summarized as follows:

| Year | Expenses | Earnings | Profit | Loss |
|------|----------|----------|--------|------|
| 1932 | $ 33,855.49 | $ 31,259.53 | | $ 2,595.96 |
| 1933 | 29,682.62 | 17,979.29 | | 11,703.33 |
| 1934 | 28,178.84 | 23,041.79 | | 5,137.05 |
| 1935 | 24,289.34 | 20,067.04 | | 4,222.30 |
| 1936 | 23,184.95 | 25,749.50 | $2,564.55 | |
| 1937 | | | | |
| 5 mos | 11,923.75 | 9,047.31 | | 2,876.44 |
| Total | $151,114.99 | $127,144.46 | $2,564.55 | $26,535.08 |

(Plaintiff's Exhibits No. 27 and 28)

A recapitulation indicates that for the period from 1932 to 1937, this agency lost $26,535.08.

In arriving at a value for the business, it must be borne in mind that Smith made commissions on the insurance written, which did not exceed fifteen (15%) per cent net. The expenses of operating the agency might be fairly averaged at $25,000 per year so that in order to make a $15,000 profit, Smith would have to earn commissions amounting to $40,000. He never did earn that much and it is problematical whether or not it ever could be done. Smith is dead and the salary of a manager of the agency would have to be included in the running expenses of the business. Then, too, it must be noted that the contracts with the various agents were obtained in a great measure through the business capacity of the decedent.

In Matter of Herrmann's Estate, 110 Misc. 475, 180 N.Y.S. 509, 510, it was stated:

"The decedent was the active head of the business; the other partner was a woman, who took no part in its management or operation,

\* \* \* \* \*

"The firm had no trade-marks or trade-names. Its success was due in a great measure to the business capacity of the decedent. His industry and his intimate knowledge of the various details connected with a manufacture of colors were the main factors in its development and successful operation. When he died these important factors were lost."

See, also, Matter of Case, 122 App.Div. 343, 106 N.Y.S. 1086.

In the case at bar, arrangements would have to be made with a new insurance company for the purpose of writing new contracts. It is very doubtful that any company would make such an agreement in view of the fact that the agency was already insolvent.

There is no evidence upon which to predicate a finding of damages in any specified amount. The dearth of evidence makes it impossible for the Court to place a value on this agency at Smith's death. Newman's fixation of damages is based upon a hypothesis not borne out by the evidence. The losses sustained by this agency over a period of years indicate the converse of the conclusion reached by Newman. The value of the business must be judged to some extent by the past. The assumption of $15,000 in profits per year by the expert cannot be accepted in view of the losses for approximately six years. The plaintiff has entirely overlooked the fact that even if Smith had lived and he were called upon to pay the debt he owed, it would have been his duty to do so. In the event that he failed to pay this debt, the Saint Paul would

have had the right to secure a judgment and execute it against the agency. Thus, there would have been no profits for the ensuing ten years.

The Court cannot find nor fix a value on this agency from the testimony now before it. In order for the plaintiff to be entitled to a judgment, a finding would have to be made that the value of the agency was in excess of $63,277.08. There is no probative evidence upon which the Court can make such a finding. It, therefore, becomes clear that while the Saint Paul converted the agency to its own use without legal right, the plaintiff's action must fall and she cannot recover damages because of the lack of proof upon which a finding of damages in her favor can be made.

Submit findings of fact and conclusions of law in accordance with this decision.

Settle order.